Filed 11/06/20  P. v. Aguilar CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057314 |
| v. | (Super. Ct. No. 17CF2394) |
| ALBERT JAVIER AGUILAR, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Stephanie M. Adraktas, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis, and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Albert Javier Aguilar of attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a); undesignated statutory references are to the Penal Code), second degree robbery (§§ 211, 212.5, subd. (c)), assault with a firearm (§ 245, subd. (a)(2)), and felon in possession of a firearm (§ 29800, subd. (a)(1)). They also found defendant personally used a firearm in the commission of the robbery (§ 12022.53, subd. (b)). The trial court found defendant had suffered a prior conviction that qualified both as a serious felony (§ 667, subd. (a)(1)) and a strike (§§ 667, subd. (d), 1170.12, subd. (b)). Defendant was sentenced to a determinate term of 13 years and four months.[1]

Defendant raises a host of claims on appeal: (1) Insufficient evidence supports his guilt as an aider and abettor to the attempted murder and the assault with a firearm charges. (2) Similarly, the evidence failed to establish he was either the perpetrator or a direct aider and abettor of the robbery. (3) His robbery conviction must be reversed because of instructional errors regarding unanimity and the elements of a robbery. (4) The prosecutor committed prejudicial misconduct in closing argument by vouching for a witness and misstating the evidence. (5) The trial court erred in denying defendant's new trial motion on the ground the jury's verdicts were "contrary to the law" and evidence. (6) Defendant's attempted murder conviction must be set aside because the recent statutory elimination of the natural and probable consequences doctrine as regards murder liability applies to attempted murders. We affirm in part, reverse in part, and remand for resentencing.

---

[1] Five years for the attempted murder (doubled to 10 under the two strikes law); one year consecutive for the robbery (doubled to two under the two strikes law); and eight months consecutive for the felon in possession charge (doubled to 16 months under the two strikes law). A four-year term for the assault with a firearm conviction was imposed and stayed under section 654. The firearm use and the prior serious felony enhancements were stricken.

2

## FACTS

Because defendant raises sufficiency of evidence claims as to three of his convictions, we lay out the facts in some detail, doing so in the light most favorable to the jury's verdicts. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the specific issues defendant raises on appeal are found in the discussion below.

A.V. was drinking with a friend one night at a bar in Santa Ana. He became uneasy because he thought that a man in the bar—later identified as defendant—was looking at him. Soon after, he was approached by a man who told him someone was outside breaking into A.V.'s pickup truck.

A.V. went out to the parking lot where he saw a bald man—later identified as codefendant Daniel Perez[2]—who was about six feet tall with a "heavy" build, sitting in the driver's seat of the truck. He also noticed a rear window in the truck had been broken. A.V. got into the passenger side of the truck, and Perez got out and moved toward the back of the truck.

A.V. slid over to the driver's side. Before he could start up the truck, Perez fired two gunshots, one striking the rear windshield and one the adjacent cab panel. A.V. said he heard "thunder sounds" from the gun, and felt "heat" behind his head. He did not immediately realize it was from a gunshot; he just thought the rear windshield had been broken.

A.V. got out of the truck and saw Perez backing away, holding a chrome revolver pointed at him. A.V. initially testified that when he saw Perez standing behind the truck, there were two other men standing about 13 feet away, in front of the truck. He later corrected his testimony and said he only saw one man, whom he later identified as defendant, standing in front. He had not seen defendant out in the parking lot until after he got out of the truck. He described defendant as a short, bearded man with a star tattoo

_____

[2] Perez and defendant were originally charged together. Perez's case was severed prior to trial and is not before us.

3

on his shaved head, and said he was the same person who had been looking at him earlier inside the bar.

A.V. said defendant was armed with a black, semiautomatic handgun. Defendant approached A.V. while holding the gun and, at some point, they began to fight. A.V. initially testified he hit defendant and defendant hit him back with his fist and the black gun. He corrected his testimony to say he had taken defendant's gun from him and hit defendant in the head with it.

During the fight, he was able to push defendant's head to the ground. Perez came up from behind and began pistol-whipping A.V., stunning him. Perez twisted A.V.'s head, tried to choke him with one arm, and bit A.V. on the shoulder, leaving a bite mark. Despite Perez's efforts, A.V. said he "never stopped beating [defendant] up." Although A.V. had the black gun in his hand during the melee, and hit defendant with it, he did not recall what ultimately happened to it.

In statements later given to police, A.V. said that at some point Perez approached him, demanded his wallet, bracelet, and a gold chain necklace, and had pulled the chain from his neck. However, when testifying, A.V. did not recollect making those statements to police. He did testify he had lost the chain, although he could not recall when and could not remember anyone taking it from him. It was only when he was discharged from the hospital and collected his belongings that he realized he had "lost a gold chain."

The fight ended when someone yelled that the police were coming. A.V. saw Perez and defendant then get into a car together and drive off. When police arrived, A.V. told them two men armed with guns had tried to take his truck from him. He was taken to the hospital, where he gave police more details.

Police subsequently received information linking defendant's DNA to forensic evidence collected in the bar parking lot on the night of the incident. They showed A.V. a set of photographs, and he identified defendant as the person he had

4

fought with.  At trial, the prosecutor showed A.V. a set of six photos of bald men, including defendant, and he stated it was he who had written under defendant's photograph:  "I had a fight with him.  He had the black gun.  I hit him on the head."

On cross-examination, A.V. was impeached with several inconsistencies between his testimony and his statements to police, and admitted he was unable to recall many details of the incident or of his conversations with police.  He acknowledged having several prior convictions and arrests, and being a drug user.  He agreed his testimony was being given under a grant of use immunity, which provided that so long as he was truthful, his statements could not be used against him.

J.S., a friend of A.V., was at the bar with A.V. on the night of the incident.  At one point, A.V. told J.S. he needed to go outside.  After about 10 to 15 minutes, J.S. also left the bar.  As he came out of the bar, J.S. saw a man standing in front of a pickup truck shooting at A.V., who was sitting in the driver's seat.  A second taller man was standing near the truck's door.  They looked like they were arguing but J.S. could not hear what was being said.  When questioned further, J.S. said the person who shot at A.V. was not the man standing in front of the truck, but instead was the tall man standing near the truck's door.  The man in front of the truck was a young, "chubby" man, about five feet four inches tall.  After the shots were fired, J.S. went back inside the bar, and then heard two more gunshots.  He later was shown some photos but was not able to identify anyone.

Officer Jimmy Correal arrived at the scene and saw A.V.'s pickup truck with what appeared to be bullet holes in the rear window and the rear cab panel underneath it.  He also saw A.V. sitting next to the truck, bleeding from a head wound.  A.V. told him two armed men, who left together in a silver Hyundai, had tried to take his truck.

Correal also spoke to A.V. later at the hospital, and he told him that when he came out of the bar, he saw one of the men in the driver's seat of his truck.  The man

5

was Hispanic, about six feet tall and 250 pounds, with a muscular build. When A.V. got into the truck, the man got out and then shot at him. A.V. then saw a shorter Hispanic man, about five feet, five inches tall, weighing about 180 pounds, come out of the bar and stand outside the truck. Both men were armed; one with a revolver and the other with a semiautomatic handgun.

A.V. told Correal the man who had been in the truck demanded his money and his gold chain. He ripped the gold chain from A.V.'s neck and then chased him around the parking lot. A fight began and A.V. knocked the semiautomatic gun out of the shorter man's hand and then smashed his head against the pavement. While he was fighting with the shorter man, the other man was pistol whipping A.V. and twisting his neck. After the fight, both men left together in a silver Hyundai.

Detective Mike Judson also interviewed A.V. A.V. told him he had been in the bar with J.S. when someone told him that his truck was being stolen. When he came out, the first man was inside his truck. The man fired a gun and, after he heard the "boom," he got out of the truck and confronted the man. A.V. then noticed the shorter man, who was armed with a semiautomatic pistol. He told Judson he had seen the shorter man inside the bar, where he had been scowling at others, before the incident. The two men chased him around the parking lot, and at the end of the chase, A.V. disarmed the shorter man and started beating him. The other man intervened and bit A.V.

A.V. told Judson that after the fight, the men took his gold chain. They also tried to take his wallet and bracelet, but he did not let them. Judson could not recall whether A.V. said Perez had taken the necklace or whether it was both of them. Judson saw some cuts on the back of A.V.'s neck, and a bite mark on his upper arm.

About four months after the incident, detective Francisco Gomez showed a photographic array containing defendant's photograph to A.V. A.V. identified defendant as the shorter man with the black gun he had fought with during the incident. A.V. also mentioned he had seen star tattoos on defendant's head. Detective Paul McClaskey

6

testified defendant has two star shaped tattoos on his temple, which were redacted from the photograph shown to A.V. He said A.V. was not able to identify the taller man who had shot at him in any of the photos he was shown. On cross-examination, McClaskey stated A.V. told him he did not realize that defendant had a gun until he took it from him and beat him with it.

A police forensics team investigated the scene and found two unfired .22-caliber cartridges, one .22-caliber shell casing, one .25-caliber shell casing, and a .22-caliber semiautomatic magazine splattered with blood. A.V.'s pickup had two bullet holes in it: one in the rear window, and another in the cab panel immediately below it.

A forensic scientist from the Orange County Crime Lab, testified he compared a swab containing a sample of defendant's DNA with evidence swabs taken from the scene of the incident and a control swab taken from A.V. One of the unfired .22-caliber cartridges had DNA on it that was determined to have come from defendant with a frequency profile of one in one trillion. Defendant was also determined to be consistent as a minor contributor to DNA found on the magazine, with a frequency profile of one in three.

The parties stipulated that on the day of the incident, defendant had previously suffered a felony conviction within the meaning of the felon-in-possession of a firearm provisions of section 29800, subdivision (a)(1).

**DISCUSSION**

*1. Sufficiency of the Evidence*

Defendant argues there was insufficient evidence to establish his derivative liability under a natural and probable consequences theory for Perez's acts of attempted murder and assault with a firearm. He also contends insufficient evidence showed he robbed A.V. of the gold chain, either as the direct perpetrator or as an aider and abettor. We reject his first claim, but agree with the second.

7

*A. Standard of Review*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104; *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 ["[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"].)

We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) "'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*).)

Similarly, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*Maury, supra*, 30 Cal.4th at p. 403.) It is the jury that weighs the evidence, assesses witness credibility, and resolves conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 (*Sanchez*).) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Simply put, an appellant "bears an enormous burden" to prevail on a sufficiency of the evidence claim. (*Sanchez,* at p. 330.)

8

## B. Aiding and Abetting Liability

Section 31 provides that all persons "concerned in the commission of a crime" are principals to that crime, regardless of whether they directly commit the act constituting the crime or aid and abet in its commission. Thus, one who "aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*Ibid.*)

For the first kind—a "direct" aider and abettor—a person aids and abets a crime if he or she aids, promotes, encourages, or instigates the commission of the crime, with knowledge of the perpetrator's unlawful purpose and the intent to facilitate the commission of the crime. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) "The actual perpetrator must have whatever mental state is required for each crime charged . . . . [A direct] aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123.) Under this theory, the crime committed is the "target" offense.

The second kind of aiding and abetting liability is based on the natural and probable consequences doctrine, which distinguishes "target" crimes and "nontarget" crimes. "'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a

9

natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164 (*Chiu*).) Thus, "[t]he natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put in motion.'" (*Ibid.*)

### C. *The Attempted Murder and Assault with a Firearm*

The prosecution's theory of defendant's liability for the attempted murder and assault with a firearm charges was that those offenses were a natural and probable consequence of Perez's breaking into A.V.'s truck and attempting to steal either it or its contents. Because defendant intended to directly aid and abet the target offense of attempted larceny, the prosecution contended he was therefore derivatively liable for Perez's subsequent crimes.

Defendant argues the target offense was "complete prior to any joint activity between [defendant] and Perez." (Capitalization omitted.) And because an aider and abettor's intent must be formed prior to or during commission of the offense aided and abetted, defendant contends he did not aid and abet the attempted larceny at all. (See *People v. Montoya* (1994) 7 Cal.4th 1027, 1039 (*Montoya*) [distinguishing aider and abettors from accomplices after the fact].) Although defendant's second premise is true, his first is not.

A.V. did not *notice* defendant's presence in the parking lot until after Perez's shots were fired and he got out of the truck, but J.S. testified that when he came out of the bar and saw the man shoot at A.V. in the truck, the second man—defendant— was also in the parking lot and standing by the truck.

10

More importantly, there was evidence of "joint activity" between defendant and Perez even *before* the parking lot encounter. A.V. testified he became uncomfortable because defendant was watching him inside the bar. It is reasonable to infer defendant was a lookout, keeping an eye out for someone leaving the bar and discovering Perez's theft-in-progress. "[A] lookout necessarily encourages and facilitates the commission of the offense. 'Such conduct is a textbook example of aiding and abetting.' [Citation.]" (*In re Gary F.* (2014) 226 Cal.App.4th 1076, 1081 (*Gary F.*).) This inference is reinforced by the fact that when A.V. did leave the bar, defendant followed, where he then approached A.V. with a gun in his hand.

Defendant points out there was no "testimony" Perez and defendant came to the bar together and concludes this shows there was no evidence they were acting in concert. However, this ignores the significance of the fact they *left together*. It is not unreasonable to conclude the two were in cahoots from the outset based on the fact they fled the scene together in the same car. Moreover, when A.V. got the best of defendant in the fight, the fact that Perez came to defendant's aid and attacked A.V. indicates defendant's presence was not merely incidental. Or as A.V. put it, "two guys" had tried to take his truck.

"'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*Nguyen, supra,* 61 Cal.4th at p. 1054.) In addition, in this context "'flight is one of the factors which is relevant in determining consciousness of guilt.'" (*Gary F., supra*, 226 Cal.App.4th at p. 1080.) All four factors are present here.

Defendant did not merely "happen by the scene of the crime." (*Campbell, supra*, 25 Cal.App.4th at p. 409.) Instead, the evidence supports an inference he was extensively involved as a lookout inside the bar and as backup once outside, both of

11

which suggest a coordinated effort.  (See *Montoya, supra*, 7 Cal.4th at p. 1043 [one who makes "it more likely that the crime will be successfully completed than would be the case absent such participation . . . logically should be liable as an aider and abettor"]; cf. *Campbell,* at pp. 409-410 [affirming aider and abetting liability for an attempted robbery where the defendant and perpetrator approached the victims together, there was "no evidence [defendant] was surprised by [perpetrator's] conduct or afraid to interfere with it," and "jury could reasonably conclude that [defendant acted] to intimidate and block [victims], divert suspicion, and watch out for others who might approach"]; *People v. Luna* (1956) 140 Cal.App.2d 662, 665 [the defendant liable where he "stood by prepared to take a hand" in a fight involving a codefendant and "aggressively entered it when he thought the proper time had arrived"].)  Similarly, "companionship" is shown here not only by Perez's and defendant's conduct *during* the crimes, but by the fact they fled together in the same car when alerted to the fact the police were coming.

Defendant also contests the jury's conclusion the attempted murder and assault with a firearm offenses were a natural and probable consequence of the attempted larceny.  He contends there was "insufficient evidence that [defendant] could have reasonably foreseen Perez's decision to shoot at [A.V.]."

However, the focus of inquiry is not on whether *defendant* could have reasonably foreseen Perez's decision to shoot at A.V.  "'"A nontarget offense is a "'natural and probable consequence'" of the target offense if, judged objectively, the additional offense was reasonably foreseeable.'" [Citation.]  'The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901.)  This "is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531; *People v. Favor* (2012) 54 Cal.4th 868, 874 [same].)  The question the jury had to resolve here was whether, from an objective standpoint, an attempted murder was a

reasonably foreseeable consequence of Perez's and defendant's attempted theft scheme in light of the entire factual background and not merely the bare-boned definition of the target crime of attempted larceny. When viewed in that full context, there was sufficient evidence in the record to allow the jury to resolve that question affirmatively.

Defendant argues that Perez's shooting at A.V. was not foreseeable because attempted larceny is not an "inherently violent" offense. He provides no authority for why that fact is determinative.[3] Moreover, as discussed, we do not merely "look to the naked elements of a target crime but must consider the full factual context which the defendant faced." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 732; *People v. Medina* (2009) 46 Cal.4th 913, 920 [same]; cf. *Chiu, supra,* 59 Cal.4th at p. 165 ["We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense"].)

The key piece of evidence in this respect is that both Perez *and* defendant were armed during these crimes. Unlike a pair of shoplifters or opportunistic pickpockets, these two attempted larceny perpetrators were both armed with guns—and *used* them. In the context of the surrounding circumstances, therefore, this attempted larceny was far from an "inherently" nonviolent offense.

It is not unreasonable to infer that one arms himself with a gun because he foresees the possibility of needing to use the weapon. In such a factual setting, a jury could reasonably find the use of those firearms, either to facilitate their planned purposes of stealing from vehicles in the bar parking lot or to make good on an escape, was a reasonably foreseeable eventuality. (Cf. *In re R.C.* (2019) 41 Cal.App.5th 283, 286 ["It was foreseeable that [minor] would use the pistol as a weapon. Why else would he bring it to the scene of the crime"].) In sum, all relevant factors are present: presence at the

---

[3] Defendant cites *United States v. Andrews* (9th Cir. 1996) 75 F.3d 552, but that case had nothing to do with "inherently violent" offenses or their foreseeable consequences.

13

scene of the crime, companionship, and conduct before and after the offense, including their flight from the scene together.  (*Nguyen, supra*, 61 Cal.4th at p. 1054; *Gary F., supra*, 226 Cal.App.4th at p. 1080.)  Defendant's convictions for attempted murder and assault with a firearm under a natural and probable consequence theory are supported by substantial evidence.

### D.  The Robbery

Defendant next contends there was insufficient evidence to convict him of the robbery, either as the perpetrator or as a direct aider and abettor.[4]  We agree.

To prove defendant guilty of robbery, the prosecution had to show either he or a coperpetrator took personal property in the possession of another, from his person or immediate presence, and against his will, by means of force or fear, with the intent to permanently deprive the owner of it.  (§ 211; see CALCRIM No. 1600.)  To be guilty of robbery as a direct aider and abettor, defendant must have formed an intent to aid or abet the robbery before or while Perez carried away the property to a place of temporary safety.  (CALCRIM No. 1603.)  "[T]he jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator."  (*People v. Majors* (1998) 18 Cal.4th 385, 408.)  Here, neither theory is supported by substantial evidence.

A.V. told Correal the man who had been in his truck—Perez—demanded his money and his gold chain.  He ripped the gold chain from A.V.'s neck and then chased him around the parking lot.  And it was only then that the fight began.  A.V. did not give Correal any details suggesting defendant's involvement.

On the other hand, A.V. told Judson that it was *after* the fight that "they" took his gold chain.  "They" also tried to take his wallet and bracelet, but he did not let

---

[4]  The prosecution's theory of defendant's liability for the robbery was not based on the natural and probable consequences doctrine.  As a result, the jury was not instructed it could base its robbery verdict on that alternative theory.

them.  Judson could not recall whether A.V. said Perez had taken the chain or whether it was "both of them."  Again, A.V. did not provide Judson with any other details about defendant's involvement.

When testifying, A.V. did not recall making those statements to either detective.  He did testify he had lost the chain, but he could not recall when and could not remember anyone taking it from him.  It was only when he was discharged from the hospital and collected his belongings that he realized he had "lost a gold chain," but he did not know what had happened to it.  He suggested in his testimony that the necklace *may* have been taken "when I was laying on the ground.  I was laying for a while unconscious on the ground."  He based this on the fact that when he *arrived* at the hospital, he had his bracelet and his wallet, but not the necklace.  However, he had earlier testified he did not realize his necklace was missing until he was discharged from the hospital.  He could not recall telling anyone he was ever unconscious.  And if he was, he did not describe when that was.

Thus, we have evidence of three distinct—and inconsistent—scenarios involving the taking of the gold chain:  (1) It did not actually happen—or at least A.V. could not remember it happening, possibly because he was unconscious at the time; (2) Perez demanded and took the necklace *before* the fight broke out; and (3) the necklace was taken by someone *after* the fight.  There was testimony to support all three possibilities, although in all three, details of defendant's exact involvement are lacking.  However, not only are all three scenarios inconsistent with each other, they are also inconsistent with the other evidence; it is not simply which of A.V.'s statements are to be believed and which are to be rejected.  These are not minor discrepancies involving extraneous details.  Nor are they the result of lapsed memories over a period of time; Correal and Judson interviewed A.V. in the hospital soon after the incident.

The taking of the necklace could not have occurred *before* the fight, as A.V. told Correal, because A.V. testified that when he got out of the truck, Perez ran away

15

towards some parked cars, as though he was trying to hide. A.V. then confronted defendant and those two began to fight. Similarly, the taking of the necklace could not have occurred *after* the fight, as he told Judson, because A.V. agreed "the entire fight stops when someone is yelling out the police are coming." And at this point, A.V. said Perez and defendant went to their car and left. Finally, as noted, A.V. testified he could neither recall the chain being taken nor ever telling the police about it. His speculation he may have been unconscious while he was robbed is inconsistent with the time line of the other events; in fact, the only time A.V. reasonably could have been unconscious is after the pair fled and before police arrived. Furthermore, it conflicts with his statement to Judson that "they" also tried to take his wallet and bracelet, but he would not "let them." The evidence of whether a robbery even occurred, let alone when, is therefore rather equivocal.

More importantly, there is no evidence noticeably pointing to *defendant's* involvement. In other words, nothing supports an inference that *defendant*, as opposed to Perez, was the direct perpetrator of the robbery, or that defendant """"aid[ed], promote[d], encourage[d], or instigate[d] the commission of the [robbery],"""" """"with knowledge of [Perez's] unlawful purpose . . . and the intent . . . [to facilitate] the commission of the [robbery]." (*Nguyen, supra*, 61 Cal.4th at p. 1054; see *McCoy, supra*, 25 Cal.4th at p. 1117 ["the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state"].)

We review for substantial evidence. Under this standard of review, our power "'*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' [Citation.]" (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681.) Even so, "substantial evidence does not mean any evidence, no matter how slight." (*People v. Baker* (2012) 204 Cal.App.4th 1234, 1247.) Rather, it is "evidence which,

16

when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) As regards the robbery in this case, such evidence is lacking, and defendant's conviction for that offense must therefore be reversed.

## 2. *Defendant's Instructional Error Claim Is Moot*

Defendant also contends the trial court incorrectly gave a unanimity instruction that undermined and conflicted with the instruction defining robbery because it conflated petty theft and robbery and failed to reiterate the force-or-fear element that distinguishes robbery from mere larceny. As a result, he argues the robbery conviction must be reversed. However, because we have reversed defendant's robbery conviction on other grounds, we need not determine whether this was error.

## 3. *There Was No Prejudicial Prosecutorial Misconduct*

Defendant next asserts the prosecutor engaged in prejudicial misconduct several times during closing argument, by vouching for a witness and by misstating the evidence. We are not persuaded.

### A. *Standard of Review*

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970 (*Frye*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"" (*People v.*

17

*Alfaro* (2007) 41 Cal.4th 1277, 1328, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) "'"'A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 943 (*Hoyt*).)

"It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument . . . ." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) "'"'[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature."'"' (*People v. Hill* (1998) 17 Cal.4th 800, 819-820 (*Hill*).)

### B. Forfeiture

Here, defendant's trial counsel did not object to some of the prosecutor's closing remarks he now claims were improper. Nor did he ask the trial court to admonish the jury. "[T]o preserve a claim of prosecutorial misconduct for appeal, "'"a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'" [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.'" (*Hoyt, supra*, 8 Cal.5th at pp. 942-943.) This requirement extends to a claim that the prosecutor vouched for a witness. (*People v. Mendoza* (2016) 62 Cal.4th 856, 906 (*Mendoza*); cf. *Hill, supra*, 17 Cal.4th at p. 820 [in

order to preserve an objection for review, defense counsel must object to the misconduct "'on the same ground'"].)  Because defendant did not object to some of the now-challenged portions of the prosecutor's closing argument, he has not preserved a challenge to these particular remarks on appeal.  We therefore only address those comments to which he did object.

### C.  Analysis

"As a general matter, '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.'  [Citation.] . . . 'Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness."  [Citation.]  The vice of such remarks is that they "may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence."  [Citation.]'  [Citation.]"  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329-1330 (*Seumanu*).)

In the context of closing argument, "'"[s]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching.'"  [Citation.]"  (*Seumanu, supra*, 61 Cal.4th at p. 1330.)  Similarly, "[a] prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them . . . ."  (*People v. Martinez* (2010) 47 Cal.4th 911, 958.)

Defendant focuses on the prosecutor's following remarks:  "[A.V.] didn't make the story up, and we know this for two reasons.  To begin with, you as jurors with your own life experience saw [A.V.] sitting on the witness stand.  You saw his demeanor.  You saw him listening to the questions that he was asked.  And you saw . . . the way that

he answered the questions. I asked him one question about . . . whether his truck was his baby and you saw the way he responded to that. . . . You saw the smile that came onto his face. That was a genuine response. It's the kind of response that a person . . . gets when they have an image in their head that they're responding to, they're reflecting on the question and they're responding to that. [¶] You also know that he didn't make the story up because he couldn't have." Defense counsel objected to these remarks as "vouching." The court overruled the objection, finding the prosecutor was referring to the evidence.

The prosecutor continued: "[A.V.] had been in a fight. He was bleeding all over the place. He'd been hit hard in the head. . . . In the time it took the police to arrive, we know that [A.V.] dragged himself over to his truck. He didn't know there were bullets on the ground. He didn't know. . . ." Defense counsel objected, stating, "No such evidence, your Honor." The court overruled the objections, again finding the prosecutor was referring to the evidence.

The prosecutor went on: "[A.V.] could not possibly have known the defendant's DNA was on one of the rounds that was on the ground," and "yet months later he identified without hesitating the defendant in a photo lineup." A.V. "was beaten, and yet in the moments before the police arrived, he provided an account that explained everything. A person could not make that up." Defense counsel objected as to both vouching and misstating the evidence, which was again overruled as argument referring to the evidence.

"[A.V.'s] account explained his bloody condition, . . . the bullet holes in his truck, . . . the blood on the pavement . . . , [and] why a magazine was there at all when we know magazines only come from semiautomatic firearms. And according to his account, the short guy who was present had a semiautomatic firearm. He later identified the same guy as the defendant whose DNA came up on one of the rounds that was on the ground next to the broken magazine . . . . Again, once you go over this and give it some thought,

20

a person could not make up a story when they're in that condition in that short amount of time."

The whole point of these remarks was to argue how A.V.'s account was generally consistent, both internally and with the physical evidence, i.e., it was not fabricated. This was not improper vouching or referring to evidence not before the jury. The prosecutor "nowhere suggested that [he] formed [his] opinion based on ""evidence available to the government, but not before the jury.""" [Citation.] Nor did [he] imply that the jury should adopt the prosecution's view because of its ""prestige, reputation, or depth of experience.""" [Citation.] Accordingly, there was neither impermissible vouching nor reliance on evidence outside the record." (*People v. Krebs* (2019) 8 Cal.5th 265, 344.) Similarly, he did not suggest he had other evidence, unpresented to the jury, to support A.V.'s credibility (compare *People v. Turner* (2004) 34 Cal.4th 406, 433 [prosecutor improperly vouched for the credibility of expert witnesses by referring to the prosecutor's personal knowledge and prior use of them]), or that he personally believed him independent of the evidence. Indeed, the prosecutor commented on A.V.'s demeanor on the witness stand—evidence in the jury's direct view—as something the jury should consider in evaluating his testimony.

"Although the prosecutor's comments invited the jury to consider the witnesses' motives in testifying, there is no impropriety in attempting to persuade jurors to draw inferences based on the evidence. [Citation.] For the same reason, the prosecutor's use of rhetorical questions, for example, why 'would [witness] be making this stuff up?' was not impermissible." (*Frye, supra*, 18 Cal.4th at p. 972.) Similarly, "there was nothing improper about the prosecutor's statements at the conclusion of closing argument telling jurors that '[witness's] stories, her testimony, her statements to police officers, have been just remarkably consistent, given without hesitation. There is no way in the world she would have been able to do that if she was covering up for things she had done.' We find these assertions to be proper comment on the evidence adduced

21

at trial and reasonable inferences flowing from such evidence, and not, as defendant contends, improper vouching on the part of the prosecutor." (*Ibid.*) So too here.

Defendant implies the prosecutor's colloquial use of the phrase "we all know" when addressing the jury reveals a nefarious reference to matters outside the record, known only to the prosecution. We disagree. Rather, the jury would have reasonably understood the prosecutor's reference to "we all know" as referring to the evidence that the prosecution had presented to the jury during the trial and all the reasonable inferences to be drawn from it; the use of the rhetorical "we" was meant to include the jury. (Cf. *People v. Bonilla* (2007) 41 Cal.4th 313, 337 [references to the truthfulness of a witness's testimony did not suggest the prosecutor had personal knowledge of facts outside the record].) Thus, to the extent "the vouching claim [was] preserved, it would be without merit because the comment would not be understood to refer to facts available solely to the government or to the prosecutor's personal knowledge or beliefs or the prestige of her office." (*Mendoza, supra*, 62 Cal.4th at p. 907.)

"It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence." (*Mendoza, supra*, 62 Cal.4th at p. 906.) To the extent defendant has not forfeited such a claim by failing to object, we again find no misconduct here.

Defendant objected as misstatements of the evidence when the prosecutor stated several times that defendant and Perez "came in the same car." The court sustained two of these objections but overruled the others.

When taken in context, the prosecutor was not referring to nonexistent evidence, he was instead drawing a reasonable inference from the evidence that was presented. Thus, he told the jury, "These two guys left in the same car. It's a reasonable conclusion to reach that they came in the same car. Assuming that they came in the same car, it's also safe to assume that two guys showing up to commit crime when they both have a gun . . . they're in on it together." In his rebuttal argument, the prosecutor

22

responded similarly to defense counsel's argument there was no evidence the two came together: "Two guys leave a bar together, they get in the same car, that's circumstantial evidence that they came together." This was a fair comment on the evidence and was not misconduct.

Finally, we also reject defendant's newly framed federal constitutional claims regarding the prosecutor's arguments. Below, "[d]efendant made no objections expressly or even impliedly referring to the federal Constitution and thus forfeited the issue." (*Ibid*. at p. 1332.) Even if were we to address these claims despite their forfeiture, they would still lack merit. "[B]ecause there was no improper vouching under state law, defendant's [federal] due process claim is also meritless." (*Seumanu,* at p. 1332.) Similarly, the comments defendant objected to at trial were based on fair inferences the prosecutor drew from the evidence presented, and did not therefore deny defendant a fair trial.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process . . . . Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).) Here, defendant makes no showing of such likelihood.

"Moreover, we presume that the jury relied on the instructions, not the arguments, in convicting defendant. '[I]t should be noted that the jury, of course, could totally disregard *all* the arguments of counsel.' [Citation.] Though we have focused on the prosecutor's closing arguments, we do not do so at the expense of our presumption that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] The trial court emphasized this rule when, as stated, it instructed the jury to follow its

23

instructions and to exalt them over the parties' arguments and statements." (*Morales, supra*, 25 Cal.4th at p. 47.) And that is what happened here. The trial court instructed the jury that attorneys' comments are not evidence, both before trial began, and again at the end of the trial.

We find no "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.) In the context of the entire closing arguments of both counsel, and the instructions given to the jury, defendant has failed to "show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner" (*Frye, supra*, 18 Cal.4th at p. 970.) Therefore, "[t]o the extent the alleged instances of misconduct were not forfeited by defendant's failure to object, we conclude none infected the trial with unfairness or deceived the court or jury." (*Hoyt, supra*, 8 Cal.5th at p. 943.) Accordingly, defendant's constitutional contentions also fail.

*4. The Denial of Defendant's New Trial Motion Was Not an Abuse of Discretion*

Defendant brought a motion for new trial under section 1181, which allows a trial court to grant a new trial when a jury's verdict is "contrary to law or evidence." (§ 1181(6).) Defendant now contends the trial court abused its discretion in denying that motion.

"'A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 730 (*Fuiava*).) In considering such a motion, the trial court does not review the jury's determination, but independently reweighs the evidence. (*Id.* at pp. 729-730.) The court is "'guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.]'" (*Id.* at p. 729.) Accordingly, the court "'"should [not] disregard the

24

verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict."'" (*Id*. at pp. 729-730.)

Here, the court employed the correct standard, stating it had "independently considered" the motion, and while the court understands it can reweigh the evidence, "in reweighing the evidence, I don't reach a different conclusion than the jury did." Moreover, it also detailed its independent characterizations of the evidence, and found it sufficient.

Defendant points to one isolated fact where he disputes the court's factual finding—whether defendant pointed his gun at A.V. at any time—and concludes from this the court denied the new trial motion solely based on that fact, thereby abusing its discretion. This claim is not only factually incorrect—the court stated it reweighed *all* the evidence—but defendant points to no authority to support such a hyperbolic claim. Moreover, as noted above, it is also inconsistent with the standard of review.

Because we have found substantial evidence supports defendant's convictions for attempted murder and assault with a firearm, the trial court did not abuse its discretion by independently finding sufficient evidence to deny the new trial motion. Put simply, there was no "manifest and unmistakable abuse of discretion." (*Fuiava, supra*, 53 Cal.4th at p. 730.)

*5. SB 1437 Does Not Apply to Attempted Murder Convictions*

Finally, defendant argues his attempted murder conviction must be reversed because of the 2019 statutory changes made by Senate Bill No. 1437. (2017-2018 Reg. Sess. (SB 1437).) We disagree.

SB 1437 changed the definition of malice and the elements of the crime of *murder*. It also created a statutory procedure, codified in new section 1170.95, by which the defendants who have been convicted of *murder* based on a natural and probable consequences theory of liability may petition the sentencing court to hear additional

25

evidence and, if appropriate, vacate the *murder* conviction if inconsistent with the now-governing law.  (See *People v. Martinez* (2019) 31 Cal.App.5th 719, 722-723 (*Martinez*).)  But does SB 1437 also eliminate the natural and probable consequences theory of liability for *attempted* murder?[5]

To date, the Courts of Appeal have gone three ways on the question.  "The first group has held that [SB 1437] did not eliminate the natural and probable consequences theory for attempted murder at all—either prospectively or retroactively. (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1092-1093, review granted Nov. 13, 2019, S258175 (*Lopez*); *People v. Munoz* (2019) 39 Cal.App.5th 738, 754, review granted Nov. 26, 2019, S258234 (*Munoz*) . . . [and] *People v. Alaybue* (2020) 51 Cal.App.5th 207, 222." (*People v. Love* (2020) __Cal.App.5th__ (*Love*) (Oct. 1, 2020, B302892).)  A different panel of our own Fourth District, Division Three reached this same conclusion in *People v. Dennis* (2020) 47 Cal.App.5th 838, 841, review granted July 29, 2020, S262184 (*Dennis*).

"The second group has held [SB 1437] eliminated the natural and probable consequences theory for attempted murder *prospectively*, but not retroactively.  (*People v. Larios* (2019) 42 Cal.App.5th 956, 966, 969-970, review granted Feb. 26, 2020, S259983 (*Larios*); *People v. Sanchez* (2020) 46 Cal.App.5th 637, 642, review granted June 10, 2020, S261768 (*Sanchez*).)  The last group has held that [SB 1437] eliminated the natural and probable consequences theory for attempted murder prospectively and retroactively as to nonfinal convictions, but not retroactively as to final convictions. (*People v. Medrano* (2019) 42 Cal.App.5th 1001, 1008, 1017-1019, review granted Mar. 11, 2020, S259948 (*Medrano*).)" (*Love, supra*, __Cal.App.5th at p. __.)

In *Love*, Division Two of the Second Appellate District, joined the first group, and held that SB 1437 "does not eliminate the natural and probable consequences

---

[5]  The issue is currently pending in our Supreme Court and *People v. Lopez,* (2019) 38 Cal.App.5th 1087 is the lead case.

theory for attempted murder on any basis—either prospectively or retroactively." (*Love, supra,* __Cal.App.5th at p. __.) "[W]e conclude that (1) [SB 1437's] inapplicability to the crime of attempted murder on a prospective basis is not clear from its text, but is clear from its legislative history and not contradicted by any of the other canons of statutory construction, and (2) even if [SB 1437] applied prospectively to the crime of attempted murder, that application would not have any retroactive effect because the bill's statutory mechanism for providing retroactive relief—namely, section 1170.95—limits relief to 'convictions' for 'murder,' which rebuts the usual presumption that ameliorative changes in the law apply retroactively to nonfinal convictions [citation]." (*Ibid.*)

Defendant has offered nothing to persuade us we should revisit our decision in *Dennis,* and we now also adopt and agree with Justice Hoffstadt's additional conclusions as expressed in *Love.* Unless and until our Supreme Court rules otherwise, we once again hold SB 1437 does not apply to attempted murder convictions.

## DISPOSITION

The robbery conviction is reversed, and the matter is remanded for resentencing. The superior court clerk is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

27